# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

TUSHBABY, INC.,

               Plaintiff,

v.

COZYONE SHOP,

               Defendant.

TUSHBABY, INC.,

               Plaintiff,

v.

MOMCOZY MATERNITY ESSENTIAL,

               Defendant.

**Lead Case No. 1:24-cv-20941**

**This document also relates to:**

**Case No. 1:24-cv-23231**

**Case No. 1:24-cv-23233**

**PLAINTIFF'S RENEWED MOTION AND INCORPORATED MEMORANDUM OF LAW IN CONSOLIDATED CASES IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER PREVENTING ASSET TRANSFER, EXPEDITED DISCOVERY ORDER, AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION**

Plaintiff TUSHBABY, INC. ("Plaintiff" or "TUSHBABY"), by and through its undersigned counsel, hereby moves the Court *ex parte* for a Temporary Restraining Order, Expedited Discovery Order, and Order to Show Cause for Preliminary Injunction.

## PRELIMINARY STATEMENT

Plaintiff sues a group of defendants engaged in the sale of blatantly infringing knock-offs of Plaintiff's products in the Amazon.com marketplace. In a clear and unambiguous violation of Plaintiff's rights under the Lanham Act and the Copyright Act, Defendants in these consolidated cases (the "Consolidated Cases") run businesses devoted to the infringement of Plaintiff's intellectual property rights, namely by importing, promoting, advertising, offering to sell, selling and/or distributing infringing products in connection with Plaintiff's federally registered trade dress and copyrights ("Infringing Products"). Based on the nature and scope of Defendants' wrongful activities, Plaintiffs will be entitled to substantial damages. Further, based on Defendants' conduct, it is clear they will go to great lengths to continue, as well as to dissipate assets necessary to satisfy any judgment, absent an injunction.

Accordingly, by this motion, Plaintiff respectfully requests: (1) an order temporarily enjoining and restraining further infringement, and restraining the assets in the accounts used by Defendants to send and receive funds or payments in connection with their infringing scheme; (2) leave to serve targeted expedited discovery to identify Defendants' true names, aliases, physical addresses, sales records, and accounts used to receive, transfer, or send funds or payments in connection with their infringement; and (3) an order to show cause why a preliminary injunction should not be issued prohibiting Defendants from continuing to infringe and restraining Defendants' assets until this case has been resolved.

## STATEMENT OF FACTS

### A. Plaintiff's Intellectual Property and Products

Plaintiff, a leading manufacturer and distributor of infant carriers, has earned a reputation for quality, reliability, and value with respect to the TUSHBABY Products, including the TUSHBABY Hip Seat Baby Carrier, which bears unique and distinctive trade dress consisting of the overall design of the product (the "TUSHBABY Trade Dress"). Declaration of Tammy Rant ("Rant Decl."), ¶¶ 4-5. Plaintiff is the registered owner of the TUSHBABY Trade Dress, as well as various copyrights ("TUSHBABY Copyrights"). *Id.*, ¶ 6.[1] Among other features, the TUSHBABY Trade Dress features a logo centered on a rounded front pouch with wraparound black straps, side zippered pockets, and mesh side pockets.

Plaintiff is the official source of TUSHBABY Products in the United States. *Id.* ¶ 4. Since at least 2018, the TUSHBABY Products embodying the TUSHBABY Trade Dress have been the subject of substantial and continuous marketing and promotion by Plaintiff, including by way of the TUSHBABY Copyrights. Plaintiff has and continues to widely market and promote the TUSHBABY Products in the industry and to consumers. Plaintiff's promotional efforts include, for example, substantial print media, the TUSHBABY Products' website and social media sites, and point-of-sale materials, all of which feature at least a portion of the TUSHBABY Copyright Registrations and the TUSHBABY Trade Dress. Plaintiff also exercises significant quality control over the TUSHBABY Products with respect to their production, marketing, and sale. The success of the TUSHBABY Products has resulted in significant infringement of the intellectual property rights subsisting in and associated with those products. Rant Decl. ¶ 9. Plaintiff would suffer

---

[1] The TUSHBABY Trade Dress is covered by U.S. Patent and Trademark Office Registration No. 7,489,071. The TUSHBABY Copyrights are covered by U.S. Copyright Office Registration Nos. VA 2-360-715, VA 2-360-714, VA 2-360-713, VAu 1-511-350, VAu 1-511-372, and VA 2-395-564.

serious financial injury if its intellectual property rights were not enforced. Rant Decl. ¶ 27.

**B.  Defendants' Unlawful and Deceptive Activities**

Plaintiff has identified the following storefronts on Amazon.com which sell Infringing Products by reference to and/or embodying the TUSHBABY Copyrights and Trade Dress:

(1) CozyOne Shop (Seller ID - AY259EXNHX4TP)

(2) Momcozy Maternity Essential (Seller ID - A3IKW5RKYL1IYC)[2]

(the "Internet Stores.") Through their highly interactive Internet Stores, Defendants promote, advertise, market, distribute, offer for sale, and sell Infringing Products embodying and/or referencing the TUSHBABY Trade Dress and TUSHBABY Copyrights to the public, including in this District. Defendants typically facilitate sales by designing Internet Stores so they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine TUSHBABY Products. Rant Decl. ¶¶ 16-17; Declaration of Adrian Punderson ("Punderson Decl."), ¶ 9. Many of the Internet Stores look sophisticated, and their orders are fulfilled by Amazon, lending an aire of legitimacy. Punderson Decl. ¶¶ 8, 11-12. They often include images and design elements that make it difficult for consumers to distinguish sites selling infringing products from authorized sites. Rant Decl. ¶¶ 16-17; Punderson Decl. ¶¶ 7, 9. Plaintiff has not licensed or authorized Defendants to use the TUSHBABY Trade Dress or TUSHBABY Copyrights, and none are authorized retailers. Rant Decl. ¶ 18.

Further, Defendants go to great lengths to conceal their identities, often using multiple fictitious names and addresses to register and operate the Internet Stores. Rant Decl. ¶¶ 19-20; Punderson Decl. ¶¶ 12. For example, Defendants' names and physical addresses used to register

---

[2] Baby-carrier, BogiWell Direct, and Cogesu US have since been dismissed from this litigation and joined with several other defendants determined to be acting together in *Tushbaby, Inc. v. Jinjang Kangbersi Trade Co., Inc. et al.*, No. 24-cv-6140-JMF (S.D.N.Y.)

Defendant Internet Stores are incomplete or contain randomly typed letters. Rant Decl. ¶ 19; Punderson Decl. ¶¶ 8, 11. Defendants regularly create new online marketplace accounts on various platforms, as well as other unknown fictitious names and addresses. Rant Decl. ¶ 20; Punderson Decl. ¶ 12. Defendants use these common tactics to conceal the full scope of their intellectual property infringement operation, and to avoid being shut down. Rant Decl. ¶ 20.

Despite operating under multiple fictitious names, there are similarities among Defendant Internet Stores. Rant Decl. ¶ 19. For example, Infringing Products for sale in Defendant Internet Stores bear similar irregularities and indicia of being infringing products, including accepted payment methods, check-out methods, and lack of contact information. Rant Decl. ¶¶ 19-20.

During its investigations, Plaintiff purchased Infringing Products from a variety of different online storefronts, including Defendants' Internet Stores. Punderson Decl. ¶¶ 5, 8, 11. The products, which were sold at deeply discounted prices associated with infringing knock-offs, were all a distinctly inferior quality to that of Plaintiff's genuine TUSHBABY Products. *Id.* ¶¶ 7, 9.

At the time that Defendants promoted, advertised, marketed, distributed, offered for sale, and sold Infringing Products, Defendants knew or should have known that the Infringing Products were infringing. Defendants know that neither they nor their suppliers are authorized to manufacture, sell, or offer for sale any products that embody or reference the TUSHBABY Trade Dress or TUSHBABY Copyrights. Based on the use of Plaintiff's registered trade dress and registered copyrights, actual and prospective purchasers are likely to believe that the Infringing Products are genuine TUSHBABY Products, injuring Plaintiff's business reputation by causing their intellectual property and the goodwill associated with them to be confused or mistakenly associated with products of different or lesser quality. Defendants have caused Plaintiff significant and substantial harm, including in this District, and Defendants know that they have caused

4

Plaintiff to suffer such harm. Rant Decl. ¶¶ 22-27.

**ARGUMENT**

## I.      THIS COURT HAS PERSONAL JURISDICTION

Before discovery, a plaintiff need only allege facts sufficient to create a prima facie showing of jurisdiction. *Posner v. Essex Ins.,* 178 F.3d 1209, 1214 (11th Cir. 1999) ("A plaintiff seeking jurisdiction over a nonresident defendant initially need only allege sufficient facts to make out a prima facie case of jurisdiction.") (citation omitted).

"Because Florida's long-arm provision 'extends to the limits on personal jurisdiction imposed by the Due Process Clause'" the court need only determine whether the "exercise of jurisdiction . . . would exceed constitutional bounds." *See Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1316 (11th Cir. 2018) (citation omitted). Due process is satisfied where (1) a non-resident defendant has contacts with the forum related to or giving rise to plaintiff's cause of action; (2) the non-resident defendant has purposefully availed itself of forum benefits; and (3) the non-resident defendant's contact with the forum are such that they could reasonably anticipate being haled into court there. *Fraser v. Smith*, 594 F.3d 842, 850 (11th Cir. 2010). Here, Defendants marketed, offered to sell, and actually sold Infringing Products to consumers nationwide, including in this District, causing injury to Plaintiff and infringing its intellectual property here. Defendants purposefully availed themselves of the commercial benefits of marketing and selling Infringing Products in the forum, such that Defendants could reasonably anticipate being haled to court here. Therefore, exercise of personal jurisdiction over Defendants comports with due process.[3]

---

[3] While a separate analysis under Florida's long-arm statute is not necessary, it is further worth noting that the statute is satisfied on multiple grounds. *First*, personal jurisdiction exists under § 48.193(1)(a)1 Fla. Stat. because this action arises from Defendant's operation of highly interactive Internet Stores to sell Infringing Products, including to customers in Florida. *See* Rant Decl. ¶ 10. Indeed, courts in this District regularly exercises personal jurisdiction over websites being used to infringe copyrights and trademarks through offering to sell and selling infringing merchandise to Florida residents over the internet. *See, e.g., Chanel, Inc. v. Individuals, P'ships & Unincorporated Ass'ns*, Case

5

## II.    DEFENDANTS MEET THE STANDARD FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

This Court has authority to "grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of Section 1125 of [Title 15]." 15 U.S.C. § 1116; *see also* 17 U.S.C. § 502; Fed. R. Civ. P. 65.

District Courts within this Circuit hold that the standards for granting a temporary restraining order and a preliminary injunction are identical. *See Emerging Vision, Inc. v. Glachman*, No. 10-cv-80734, 2010 WL 3293346, at *3 (S.D. Fla. June 29, 2010) (citing *Siegel v. LePore*, 120 F. Supp. 2d 1041 (S.D. Fla. 2000) aff'd, 234 F.3d 1163 (11th Cir. 2000)). In order to obtain a temporary restraining order or a preliminary injunction, a party must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *see also Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (affirming entry of PI and freezing of assets).

A plaintiff need not show that there is a likelihood of success on the merits of all their claims for relief; they must show a likelihood of success on the merits of at least one of their claims. *Sapphire Consulting Servs. LLC v. Anderson*, 2021 WL 1053276, at *3 (M.D. Fla. Feb. 12,

---

No. 21-cv-62335-WPD (S.D. Fla. Nov. 16, 2021) (preliminary injunction order after granting TRO); *The North Face Apparel Corp., et al. v. The Individuals, Corporations, Limited Liab. Companies, Partnerships, and Unincorporated Associations Identified on Schedule A*, No.: 0:22-cv-60193 (S.D. Fla. Jan. 28, 2022) (same). *Second*, personal jurisdiction exists under § 48.193(1)(a)6 because Defendants committed tortious acts—copyright and trademark infringement—outside of Florida via high-interactive Internet Stores which were continuously accessible to Florida residents, and in fact shipped Infringing Products *to* Florida residents. Rant Decl. ¶ 12.

2021); *Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1384 (M.D. Fla. 2005) *aff'd*, 403 F.3d 1223 (11th Cir. 2005). Here, Plaintiff's evidence establishes that it is likely to prevail on all its claims.

### A.  Plaintiffs are Likely to Succeed on All Their Claims Against Defendants

#### 1.  Trade Dress Infringement

A plaintiff bringing a trade dress infringement claim must show: (1) it has valid, protectable trade dress; (2) defendant made unauthorized use of the trade dress in commerce in connection; and (3) the defendant's use is likely to cause consumer confusion. 15 U.S.C. § 1114(1). Registration of a trade dress on the principal register enables the owner to sue an infringer under 15 U.S.C. § 1114 and entitles the owner to a presumption of validity. *See* 15 U.S.C. § 1115(a); *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000). The owner of the registered trade dress is therefore entitled to a rebuttable presumption that the trade dress is distinctive and nonfunctional. *See, e.g.*, *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863 (8th Cir. 1994).

Plaintiff is the owner of the registered TUSHBABY Trade Dress, which consists of the overall design and configuration of the product featuring a distinctive rounded pouch with a logo centered on the front, black wraparound straps with various neutral colors for the outer shell material, and the configuration of the side zipper and mesh pockets. The TUSHBABY Trade Dress and related TUSHBABY Products are shown on Attachment A.

The TUSHBABY Trade Dress is registered on the Principal Register, thereby entitling it to the presumption that it is distinctive and nonfunctional. Plaintiff therefore need only prove that the Defendants' uses of the TUSHBABY Trade Dress are likely to cause consumers confusion as to the source of the products. The Eleventh Circuit considers the following factors in determining whether a likelihood of confusion exists: "(1) the strength of the trade dress, (2) the similarity of

design, (3) the similarity between the products offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent, including whether the defendants hope to gain competitive advantage by associating his product with the plaintiff's established trade dress; and (7) actual confusion." *Tardieu Grp., Inc. v. MEC Apparel Grp., Inc.*, 2009 WL 10667537, at *3 (S.D. Fla. May 5, 2009) (citing *AmBrit*, 812 F.2d at 1538).  Because the inquiry is case-specific, a court is not required to consider every factor, but only those relevant to the case. *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc*., 716 F.2d 833, 840 & n.17 (11th Cir. 1983). The determination does not require that a majority of factors favor confusion, if the overall circumstances tend to establish confusion. *Id*.; see also *AmBrit*, 812 F.2d at 1538 ("[L]ikelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists. The appropriate weight to be given to each of these factors varies with the circumstances of the case.") In this case, the factors establish a substantial likelihood that Defendants' use of the TUSHBABY Trade Dress will confuse the consuming public about the source of the products.

### a. Strength of Trade Dress

A proper analysis of the strength of trade dress should consider the type of trade dress (e.g., whether the elements are arbitrary, suggestive, etc.) and the extent of third-party use. *AmBrit,* 812 F.2d at 1539. The protectable elements of the TUSHBABY Trade Dress are nonfunctional and arbitrary—that is, they are not suggestive or descriptive of the product, serving only to aid in giving the product its distinctive look. *See AmBrit,* 812 F.2d at 1536 (finding the foil wrapper of a Klondike bar to be suggestive of the "coldness of the product" and thus inherently distinctive based on the color and design of the wrapper). For example, the choice of including a rounded front pouch with a centered logo placed on the front is unnecessary and simply included for aesthetic

purposes, and the configuration of the pockets and materials, including mesh, is arbitrary and could be changed without changing the functionality. The TUSHBABY Trade Dress aligns with the aesthetic and distinctive branding of TUSHBABY Products. Further, these elements are not used by anyone else. For example, no third-party baby carrier has the same overall configuration and color scheme as the TUSHBABY Hip Seat Baby Carrier.

Plaintiff's longtime use, industry recognition, significant advertising expenditures, and large volume of sales have further strengthened the trade dress. See *Home & Land Affiliates, LLC v. Homes & Loans Magazine, LLC*, 598 F. Supp. 2d 1248, 1260 (M.D. Fla. 2009) (*citing John H Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 n. 13 (11th Cir. 1983)). Plaintiff has been using its trade dress for years, including operating its business under the name TUSHBABY since 2017. Plaintiff has expended considerable money and effort in the past seven years advertising its products in connection with the TUSHBABY Trade Dress. In that seven-year span, Plaintiff's efforts have resulted in extensive revenue from the global sales of its trade dress-protected products. Additionally, Plaintiff's extensive marketing and national media attention, including a feature on hit television show "Shark Tank" in 2019 and receipt of the Mom's Choice Award in 2022, has further reinforced the consuming public's association between Plaintiff and the TUSHBABY Trade Dress, establishing significant goodwill and brand recognition. Overall, the TUSHBABY Trade Dress is strong and, thus, this factor weighs strongly in favor of Plaintiff.

**b.  Similarity of Trade Dress**

In determining the similarity of the trade dress, the court compares the trade dress and considers "the overall impressions that the [trade dress] create, including the sound, appearance, and manner in which they are used." *Frehling Enters., Inc. v. Grp. Int'l/Select, Inc.*,192 F.3d 1330, 1337 (11th Cir. 1999) (internal citation omitted).

9

The defining characteristics of the TUSHBABY Hip Seat Baby Carrier are the TushBaby Logo centered on a rounded front pouch, black wraparound straps, a variety of neutral colors for the outer shell material, and the configuration of side zipper and mesh pockets. Defendants have appropriated these defining characteristics, which make up the TUSHBABY Trade Dress, wholesale. A comparison of the parties' respective products is set forth on Attachment B.

The overall impressions of Plaintiff's and Defendants' trade dress is practically identical. Defendant misappropriates every nonfunctional detail of Plaintiff's product in advertising its product. This factor weighs heavily in favor of Plaintiff.

### c.  Similarity of Products

Defendants' advertised product is the exact same type of product as the TushBaby Hip Seat Baby Carrier, albeit far inferior. Punderson Decl. ¶¶ 7, 9. Because the products offered are identical, this factor weighs heavily in favor of Plaintiff.

### d.  Similarity of the Sales and Advertising Methods

A high degree of similarity between sales methods and use of the same advertising media increases the likelihood of confusion. *Suzuki Motor Co. v. Jiujiang Hison Motor Boat Mfg. Co.,* No. 1:12-cv-20626, 2012 WL 640700, at *3 (S.D. Fla. Feb. 27, 2012). Here, Defendants sell on Amazon.com, right alongside Plaintiff, using similar, if not identical, advertising imagery. Defendants' listings include nearly identical information, description—such as receipt of the "Mom's Choice Award"—and graphics to Plaintiff's website and listings, along with use of the TUSHBABY Trade Dress, as shown on Attachment C hereto. This factor also weighs strongly in Plaintiff's favor. *See id.*

### e.  Defendants' Intent

The evidence of Defendant's intent to deceive customers is overwhelming. "If it can be

shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiffs business reputation, this fact alone may be enough to justify the inference that there is confusing similarity." *Frehling,* 192 F.3d at 1340. Defendants' wholesale appropriation of the TUSHBABY Trade Dress and advertising undoubtedly supports an inference that Defendant intended to benefit from Plaintiff's reputation. *See Playboy Enterprises, Inc. v. P.K. Sorren Export Co. of Fl,* 546 F. Supp. 987, 996 (S.D. Fla. 1982). The only possible conclusion is that Defendants have intentionally misappropriated the TUSHBABY Trade Dress to derive a benefit from Plaintiff's reputation and goodwill. This factor weighs strongly in Plaintiff's favor.

### 2.  Unfair Competition and False Designation of Origin

Because "the legal standard for unfair competition, which includes palming off and false designation of origin, and trademark infringement under both the Lanham Act and common law has been held be essentially the same," *Turner Greenberg Assocs., Inc. v. C&C Imports, Inc.*, 320 F. Supp. 2d 1317, 1330 (S.D. Fla. 2004), *aff'd,* 128 F. App'x 755 (11th Cir. 2005) (citing *Chanel, Inc. v. Italian Activewear of Florida, Inc.,* 931 F.2d 1472, 1475 n. 3 (11th Cir.1991)), the above analysis applies equally with respect to Plaintiff's trade dress claims under 15 U.S.C. § 1125 and Florida common law. *See also Conair Corp. v. K & A Beauty, LLC,* No. 6:14-CV-920-CEM-TBS, 2014 WL 4385635, at *4 (M.D. Fla. Sept. 4, 2014) (upholding Florida courts recognition that a common-law unfair competition claim for trade dress infringement has the same elements as a federal trade dress infringement claim under § 43(a) of the Lanham Act.). For the reasons discussed above, Plaintiff is also likely to succeed on the merits of its unfair competition claims.

### 3.  Copyright Infringement

"To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist*

*Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S. Ct. 1282, 1296, 113 L. Ed. 2d 358 (1991); 17 U.S.C. § 501. The latter element is generally shown by proving that the infringer "had access to the protected work and that "substantial similarity" exists between the protected and copied works." *Sharpshooters, Inc. v. Ret. Living Pub. Co.*, 932 F. Supp. 286, 288 (S.D. Fla. 1996) (citing *McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 318 (9th Cir. 1987)).

Here, Plaintiff is likely to succeed on the merits. *First*, Plaintiff owns all exclusive rights in various copyrights in connection with the marketing and sale of the TUSHBABY Products. Rant Decl. ¶ 6. *Second*, Plaintiff has shown that Defendants have unlawfully copied the TUSHBABY Copyrights through promotional imagery and information in connection with the sale of Infringing Products, which appropriates expressive material from the TUSHBABY Copyrights wholesale. Rant Decl. ¶¶ 11, 25-26. There is no question Defendants had access to the TUSHBABY Copyrights, given that (1) the TUSHBABY Copyrights are widely available on the internet in connection with the advertisement and sale of the TUSHBABY Products; and (2) Defendants have intentionally capitalized upon Plaintiff's success and goodwill in advertising and selling Infringing Products. Rant Decl. ¶¶ 7-9, 16; Punderson Decl. ¶ 7. There is further no question that Defendants have directly copied the TUSHBABY Copyrights to create imagery that is substantially similar, and indeed practically identical in some cases. A non-exhaustive sampling of the clearly unlawful appropriation of the TUSHBABY Copyrights is set forth on Attachment D.

### B. <u>Plaintiff Will Suffer Irreparable Injury Without Immediate Relief</u>

"Once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim, there is a presumption of irreparable harm." *Commodores Entm't*, 2014 WL 5285980, at *4 (citing *Tally-Ho*, 889 F.2d at 1029); *see also* 15 U.S.C. § 1116(a). Even without a presumption, the Eleventh Circuit recognizes that "[a] strong showing of the likelihood of

confusion could by itself show a serious threat of irreparable harm." *King Ranch, Inc. v. King Ranch Contractors, LLC*, 2013 WL 2371246, at \*12 (M.D. Fla. May 30, 2013) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir. 1998)); *accord 7-Eleven, Inc. v. Kapoor Bros., Inc.*, 977 F. Supp. 2d 1211, 1227 (M.D. Fla. 2013) (explaining that trademark owners face irreparable harm due to the loss of control over the alleged trademark infringer's product).

Here, Plaintiffs will suffer irreparable harm unless this Court issues a temporary restraining order and preliminary injunction pending resolution of this case. First, Plaintiff's trade dress and copyrights are critical to its business. Rant Decl. ¶¶ 5, 7. Plaintiff has expended significant resources building name recognition and making its brand, including its associated trade dress and copyrights, extremely valuable as source identifiers, and indicators of Plaintiff's substantial goodwill, earned over years in the market. *Id.* ¶ 8. Meanwhile, Defendants are offering low-quality knock-offs for a fraction of the market price, devaluing the market for genuine TUSHBABY Products, and irreparably damaging Plaintiff's reputation and goodwill therein. Rant Decl. ¶¶ 23-26; Punderson Decl. ¶ 7. Second, Plaintiff's losses are difficult to measure. The impact of Defendants' illegal activities, including the consumer reaction to knock-offs which are impacting market pricing and which likely do not pass the same global verification tests and federal safety standards, thereby posing safety risks, is widespread and cannot be quantified. Rant Decl. ¶¶ 5, 24. Finally, given the secretive and duplicitous way in which Defendants conduct business, Defendants may be unable or unwilling to pay Plaintiff's damages should it prevail. *Id.* ¶ 21.

## C.  The Balance of hardships and Public Policy Considerations Favor Plaintiff

 "[A] company cannot build a business on infringements and then argue that enforcing the law will cripple that business." *C.B. Fleet Co., Inc. v. Unico Holdings, Inc.*, 510 F. Supp. 2d 1078, 1083 (S.D. Fla. 2007) (*quoting CBS, Inc. v. Primetime 24 Joint Venture*, 9 F. Supp. 2d 1333, 1345

(S.D. Fla. 1998)). Simply put, Defendants' hardship—to cease infringing Plaintiff's intellectual property rights—is not outweighed by the harm that Plaintiff will continue to incur if the injunction is not granted. *See Venus Fashion, Inc. v. Changchun Chengji Tech. Co.*, 2016 U.S. Dist. LEXIS 206760, at *6 (S.D. Fla. Sept. 9, 2016); *see also Davidoff & Cie, S.A. v. PLD Int'l*, 263 F.3d 1297, 1304 (11th Cir. 2001). Moreover, an injunction here is in the public interest because it will prevent the public from being defrauded and misled by Infringing Products which may pose safety risks. *See Venus Fashion, Inc. v. Changchun Chengji Technology Co., Ltd.*, 2016 WL8678883 (S.D. Fla. Sept. 9, 2016). The public has an interest in not being misled as to the origin, source, or sponsorship of protected products. *See Nailtiques Cosm. Corp. v. Salon Sciences, Corp.*, 1997 WL 244746, 5, 41 U.S.P.Q.2d 1995, 1999 (S.D. Fla. 1997) (public interest "in not being victimized and misled" are important considerations regarding grant of injunctive relief).

In this case, the injury to the public is significant, and the injunctive relief that Plaintiff seeks is specifically intended to remedy that injury by dispelling the public confusion created by Defendants' actions. Unless Defendants' unauthorized use of the TUSHBABY Copyrights and TUSHBABY Trade Dress is enjoined, the public will continue to be confused and misled by Defendants' conduct. For these reasons, granting Plaintiff's Motion for Entry of a Temporary Restraining Order is in the public interest.

## III. PLAINTIFFS ARE ENTITLED TO AN ORDER PREVENTING THE TRANSFER OF DEFENDANTS' ASSETS

Plaintiff requests an *ex parte* restraint of Defendants' assets so that Plaintiff's right to an equitable accounting of Defendants' profits from sales of Infringing Products is not impaired. Without this restraint, Defendants are likely to fraudulently transfer financial assets overseas. It appears that the Defendants hold most of their assets in foreign countries, making it easy to conceal assets, which will render an accounting by Plaintiff meaningless.

A. <u>**The Court Possesses Ample Authority Under the Federal Rules and Its Inherent Equitable Powers to Attach Defendants' Assets**</u>

Courts have the inherent authority to issue a prejudgment asset restraint when plaintiff's complaint seeks relief in equity. *Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007); *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995); *Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992). Plaintiff has demonstrated above that it will likely succeed on the merits of its claims. As such, Plaintiff will be entitled to an accounting and payment of the profits earned by Defendants throughout their online intellectual property infringement scheme. 17 U.S.C. § 504. Thus, this Court has the inherent equitable authority to grant Plaintiff's request for a prejudgment asset freeze to preserve the relief sought by Plaintiff. *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger USA, Inc.*, 80 F.3d 749 (2d Cir. 1996); *see also SEC v. ETS Payphones*, 408 F.3d 727, 735 (11th Cir. 2005) (finding it proper to freeze all the defendant's assets, because it was necessary to preserve sufficient funds for the potential disgorgement in the case).

Courts, including the Eleventh Circuit, previously entered an asset restraining order due to the illicit nature of the infringement and the ability of infringers to practically eliminate their evidentiary trails by conducting their business entirely over the Internet. *See e.g., Levi Strauss & Co. v. Sunrise Int'l Trading*, 51 F.3d 982 (11th Cir. 1995); *Reebok Int'l Ltd. v. Marnatech Enter.*, 737 F. Supp. 1515 (S.D. Cal. 1989), aff'd, 970 F.2d 552 (9th Cir. 1992). In *SEC v. ETS Payphones*, the Eleventh Circuit entered an order granting an asset restraint against an alleged infringer where the complaint included a request for a permanent injunction and the equitable remedy of disgorgement of the alleged infringer's profits. *SEC v. ETS Payphones*, 408 F.3d 727, 735 (11th Cir. 2005) (finding it proper to restrain all of the defendant's assets to preserve funds for disgorgement). Furthermore, the Court has previously emphasized the necessity of such an asset

restraint holding that a "request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *Fed. Trade Commission. United States Oil and Gas Corp*., 748 F.2d 1431, 1433-34 (11th Cir. 1984) (court may exercise its full range of equitable powers, including a preliminary asset restraint, to ensure that permanent equitable relief will be possible).

Here, Plaintiffs seek an equitable accounting and disgorgement of Defendants' illicit profits under the Lanham Act and Copyright Act. Plaintiff has shown a likelihood of success on the merits, an immediate and irreparable harm suffered because of Defendants' activities, and that, unless Defendants' assets are frozen, Defendants will likely hide or move their ill-gotten funds to offshore bank accounts to frustrate this Court's ability to render final judgment. Thus, the Court may exercise its equitable authority to preserve the status quo and maintain its ability to provide an equitable remedy. *See Sec. & Exch. Comm'n v. Quiros*, No. 16-CV-21301, 2016 WL 11578637, at *17 (S.D. Fla. Nov. 21, 2016).

In terms of the equitable factors, Plaintiff has already shown that they are likely to succeed on the merits and irreparable harm. *See supra* Section II.A. See also 15 U.S.C. § 1116(a). Moreover, irreparable harm exists where, as here, "without an injunction a meaningful decision on the merits would be impossible." *See, e.g., Productos Carnic, S.A. v. Central Am. Beef and Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980). A demonstration of a defendant's intent to frustrate a judgment on the merits qualifies as a showing of irreparable harm. See, e.g., *Productos Carnic, S.A.*, 621 F.2d at 686.

Here, circumstances overwhelmingly evidence Defendants' intent to frustrate the enforcement of a judgment. Defendants deliberately set up Internet Stores to sell unauthorized and unlicensed Infringing Products to unknowing consumers. Defendants attempt to avoid liability by

concealing their identities, often using multiple fictitious or incomplete names and addresses to register and operate their network of Defendant Internet Stores. Rant Decl. ¶ 19-20; Punderson Decl. ¶ 12. Defendants often create new online marketplace accounts on various platforms using both known and unknown fictitious identities to conceal the full scope of their infringement and avoid being shut down. *Id*. They are not legitimate businesses, which typically have readily identifiable assets that may be used to satisfy judgments. Rather, Defendants appear to hold most of their assets in foreign countries, making it easy to conceal or move assets, which will render an accounting by Plaintiff meaningless.

Finally, the balance of hardships and public policy considerations decidedly favor Plaintiff. *See supra*, Section II.A. Defendants will suffer no cognizable hardship as they have no right to use the profits of an illegal enterprise to continue supporting their unlawful activities or for personal use.

### B.  Ex Parte Relief Is Warranted

Rule 65(b) of the Federal Rules of Civil Procedure provides that the Court may issue relief *ex parte* where immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition. Fed. R. Civ. P. 65(b). Here, Defendants operate their illicit businesses under the cover of anonymity. If they receive advance notice of the temporary restraining order attaching Defendants' assets, Defendants will have the opportunity to moot Plaintiff's ultimate relief simply by moving their assets to another account beyond the reach of this Court. The need for *ex parte* relief is magnified in today's global economy where infringers of intellectual property rights can operate over the Internet in an anonymous fashion. Plaintiff is unaware of both the true identities and locations of Defendants, as well as other Defendant Internet Stores used to distribute Infringing Products. If given notice, Defendants can,

and likely will move any assets from U.S.-based financial accounts and take other steps to evade enforcement such as redirecting traffic to other storefronts they own and/or contrl. Courts have recognized that civil actions against counterfeiters present special challenges that justify proceeding on an *ex parte* basis. *See Dell Inc. v. BelgiumDomains, LLC*, Case No. 07-22674, 2007 WL 6862341, at *2 (S.D. Fla. Nov. 21, 2007) (*ex parte* relief more compelling where Defendants' scheme "is in electronic form and subject to quick, easy, untraceable destruction by Defendants"); *see also, e.g.*, *Safety Nailer LLC v. The Individuals*, 21-cv-22703-BLOOM/Otazo-Reyes (S.D. Fla. Sep. 21, 2021); *Edge Sys. LLC et al. v. Aguila*, 14-cv-24517-MOORE/McAliley (S.D. Fla. Dec. 2, 2014); *Animaccord Ltd. v. The Individuals*, 20-cv-25002-SCOLA/GOODMAN (S.D. Fla. July 7, 2021). Plaintiff therefore requests issuance on an ex parte basis.

## IV.   PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY

The Supreme Court has held that "federal courts have the power to order, at their discretion, the discovery of facts necessary to ascertain their competency to entertain the merits." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Courts have wide latitude in determining whether to grant a party's request for discovery. *Id.* (citation omitted). Further, courts have broad power over discovery and may permit discovery to aid in the identification of unknown defendants. *See* Fed. R. Civ. P. 26(b)(2). While discovery generally must await the parties' Rule 26(f) conference, district courts may order expedited discovery upon a showing of "good cause." Fed. R. Civ. P. 26(d); *see also TracFone Wireless, Inc. v. Adams*, 304 F.R.D. 672, 673 (S.D. Fla. 2015). Courts consider the following factors in determining whether a party has shown good cause for expedited discovery: (1) whether a motion for preliminary injunction is pending; (2) the breadth of the requested discovery; (3) the reason(s) for requesting expedited discovery; (4) the burden on the opponent to comply with the request for discovery; and (5) how far in advance of the typical

discovery process the request is made. *Betty's Best, Inc. v. Individuals, P'ships & Unincorporated Ass'ns Identified on Schedule 'A,'* 2023 WL 7279324, 2023 U.S. Dist. LEXIS 197721, at *3-*4 (S.D. Fla. Nov. 3, 2023) (citation omitted).

Here, the first factor weighs in Plaintiff's favor, as there is a pending motion for injunctive relief. The second factor also weighs in Plaintiff's favor, as Plaintiff's discovery request is tailored to obtain only the information necessary to "preserve the status quo," as is required. *See Betty's Best, Inc.*, 2023 U.S. Dist. LEXIS 197721 at *4. The expedited discovery requested in the proposed order is narrow in scope, limited to include only what is essential to identify and locate Defendants and prevent further irreparable harm. *See, e.g., TracFone Wireless, Inc. v. Holden Prop. Servs., LLC*, 299 F.R.D. 692, 693-94 (S.D. Fla. 2014). Without the ability to obtain the requested information, Plaintiff cannot name and serve the proper defendants and will be unable to litigate its claims. There is simply no other means for Plaintiff to ascertain Defendants' true identities without the requested discovery. Additionally, discovery of these financial accounts so that they can be frozen is necessary to ensure these activities can be contained. Without discovering Defendants' bank and payment system accounts, any asset restraint would be of limited value because Plaintiff would not know the entities upon whom to serve the order. Accordingly, Plaintiff has persuasive reasons to request expedited discovery, thereby satisfying the third factor.

Fourth, the burden on Defendants to comply with the request for discovery should be minimal, as Plaintiff's discovery request is so narrow in scope, merely seeking identification and financial information that should be readily available and easily accessible to Defendants. *See, e.g., Thyssenkrupp Elevator Corp. v. Hubbard*, 2013 WL 1953346, 2013 U.S. Dist. LEXIS 66949, at *3 (S.D. Fla. May 10, 2013). Further, Plaintiff's undersigned counsel is aware that the third-party marketplaces and payment services contemplated in the proposed order have cooperated with

intellectual property owners in prior cases and under similar circumstances and are accustomed to doing so as part of their business operations. These third parties can comply with these expedited discovery requests without undue burden. *See, e.g., TracFone Wireless, Inc. v. Holden Prop. Servs., LLC*, 299 F.R.D. 692, 694 (S.D. Fla. 2014) (granting plaintiff's request for expedited discovery from third parties, including Amazon.com, in a trademark infringement/unfair competition action).

Finally, the fifth factor also weighs in Plaintiff's favor. Without expedited discovery, Defendants can hide their true identities and continue their alleged misconduct, thereby preventing Plaintiff from mitigating the harm caused to it by Defendants. Without expedited discovery, Plaintiff cannot determine who the entities behind the storefronts are, and this case has been pending for several months without any ability to identify such entities. *Contra Mineola Holdings v. Stoney Brook Fin. P'ship*, 2020 WL 10357241, 2020 U.S. Dist. LEXIS 257482, at *6 (M.D. Fla. Dec. 8, 2020) (denying plaintiff's motion for expedited discovery where plaintiff had identified but not yet served defendants); *Contra Adapco, LLC v. Heylek*, 2019 WL 12021671, 2019 U.S. Dist. LEXIS 237392, at *5 (M.D. Fla. Apr. 10, 2019) (denying plaintiff's expedited discovery request made mere days after filing the complaint). Plaintiff has thus established good cause for expedited discovery to identify Defendants, including their names, aliases, contact information, and the financial accounts linked to their allegedly infringing activities.

## V.       A BOND SHOULD SECURE THE INJUNCTIVE RELIEF

Because of the strong evidence of counterfeiting and infringement, Plaintiff requests that this Court require Plaintiff to post a bond of no more than five thousand dollars ($5,000.00), subject to increase at the Court's discretion should an application be made in the interest of justice.

## CONCLUSION

In sum, Plaintiff respectfully requests that the Court grant the relief requested herein.

Dated: September 27, 2024

Respectfully submitted,

**James M. Slater**
James M. Slater (FBN 111779)
ESCA Legal LLC
9000 Dadeland Blvd. #1500
Miami, FL 33156
Tel.: (305) 523-9023
james@esca.legal

Leo M. Lichtman (admitted *pro hac vice*)
ESCA Legal LLC
1117 Sixth Avenue, Fifth Floor
New York, New York 10036
Tel.: (347) 745-2535
leo@esca.legal

*Attorneys for Plaintiff Tushbaby, Inc.*

**Attachment A**

*TUSHBABY Trade Dress and TUSHBABY Products*






**Attachment B**

| *Plaintiff's Products* | *Defendants' Products* |
|---|---|










**Attachment C**

*Plaintiff's Advertising*

*Defendants' Advertising*















*Plaintiff's Advertising*   *Defendants' Advertising*















*Plaintiff's Advertising*       *Defendants' Advertising*

**About this item**

- THE ORIGINAL AND ONLY USA SAFETY CERTIFIED HIP BABY CARRIER: As seen on SHARK TANK, Good Housekeeping, BuzzFeed, Parents Magazine, Redbook, Woman's Day, Cheddar, Daily Mail, Best Products, etc. TushBaby is a USA business that you can trust; We put your baby's safety first

- LIGHTWEIGHT + VERSATILE: Weighing less than 1 pound, TushBaby doubles as a diaper bag with large storage pockets; No need for the extra bulk of a diaper bag

- TUSHBABY WILL HELP YOU FOR YEARS: Made for newborn up to 3 year old toddlers (or 44 lbs); Four positions: feeding, side carrying, front facing, and face to face

- APPROVED BY PEDIATRICIANS FOR BABIES AND CHIROPRACTORS FOR ADULTS: The ergonomic seat puts your baby's hips in the pediatric-recommend M position, and reduces painful spine curvature for grown-ups

- MULTIPLE STORAGE POCKETS: TushBaby doubles as a diaper bag with large storage pockets. Throw diapers and wipes in the storage beneath the seat. Access your keys, phone, and pacifiers in the side pockets. Store a bottle in the holder. Attach toys & sanitizer to the loops. And fold it right up for easy transport. Leave your stroller, clunky carrier, purse, and diaper bag in the minivan.

**About this item**

- EFFORTLESS ON, OFF, AND ALL AROUND: With user-friendly buckles and intuitive design, CozyOne Hip Seat Carrier makes getting your baby in and out a breeze, even when you're on the go. The simple one-hand operation allows for easy adjustments and quick transitions, giving you the flexibility to adapt to your baby's needs without missing a beat.

- ORGANIZED AND ACCESSIBLE STORAGE POCKETS: CozyOne's hip seat carrier doubles as a diaper bag with multiple storage compartments. Keep diapers and wipes in the hidden storage beneath the seat, access essentials like keys and phones in the side pockets, and store a bottle in the designated holder. Attach toys and sanitizer to the handy loops, and easily fold the carrier for effortless transport.

- ENDORSED BY EXPERTS FOR BABIES AND PARENTS ALIKE: Pediatricians recommend CozyOne's ergonomic seat for its M-position design, promoting healthy hip development for babies. Chiropractors approve our carrier for its unique design, which helps alleviate back pain and spine curvature for adults.

- ADAPTABLE AND LONG-LASTING: CozyOne grows with your little one! Our hip seat carrier is suitable for newborns up to 3-year-old toddlers (or 44 lbs). Choose from four versatile carrying positions: nursing, side carrying, front facing, and face-to-face bonding time.

- BACK PAIN RELIEF FOR CAREGIVERS: CozyOne Hip Seat Carrier is thoughtfully designed to distribute your baby's weight evenly across your hips and waist, taking the pressure off your back and shoulders. Say goodbye to backache and discomfort – our carrier provides the support you need for long-lasting comfort during extended outings or daily tasks.

- BREATHABLE AND SKIN-FRIENDLY MATERIALS: Made from premium, soft-touch fabric, CozyOne's carrier is gentle on your baby's delicate skin, while the breathable mesh keeps both you and your baby cool and comfortable during warm weather or extended outings.

- SAFETY-FIRST DESIGN WITH NON-SLIP SEAT: CozyOne Hip Seat Carrier prioritizes your baby's safety with a non-slip seat surface and secure buckles, giving you peace of mind knowing your little one is safe and snug in our carrier. We're committed to providing the highest level of safety for your precious cargo!

**About this item**

- Innovative 3D Abdominal and Lumbar Support: The original 3D abdominal support and widened waist belt feature an EVA massage pad that relieves abdominal pressure. The seat evenly distributes the baby's weight, alleviating pressure on parents' back and shoulders. The widened magic tape and buckle design provide double protection for your hips.

- Comfortable and Ergonomic Design: The ergonomically designed seat places your baby's hips in the pediatric-recommended "M" position, reducing strain on the adult's spine. The 30-degree inclined seat brings your baby's body closer to you for enhanced safety and a more intimate experience.

- Multiple Carrying Positions: Momocozy Hip Seat Carrier is suitable for newborns up to 36 months (or 45 pounds). It offers multiple positions: inward-facing, outward-facing, side carrying, and feeding position. This provides your baby with various options to adjust their sitting posture, allowing for more interactive moments and making outings with your baby a breeze.

- Multiple Storage Pockets: Momocozy Hip Seat Carrier also functions as a diaper bag, featuring multiple storage pockets. Store diapers and wipes in the concealed storage space beneath the seat, essential items like keys and phones in the side pockets, and baby bottles in the designated holder. It can also be compactly folded for easy transport of your baby essentials during travel.

- Lightweight & Versatile: Momocozy Baby Hip Seat Carrier weighs less than 1 pound, making it a breeze to carry. It also doubles as a diaper bag with a spacious storage compartment. The Momcozy hip seat is designed to accommodate parents of various body types, with two sizes available: M (27-45 inches waist) and L (40-55 inches waist). Please measure your waist before placing an order.

*Results of Amazon Search for "Tushbaby Baby Hip Carrier"*
*Produce Listings for Plaintiff's and Defendants' Products*



**Attachment D**

*Plaintiff's Imagery*

*Defendants' Imagery*




















