## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

| | |
|---|---|
| TUSHBABY, INC., | |
| Plaintiff, | |
| v. | Case No. 24-cv-20941-DSL |
| THE CORPORATIONS, LIMITED LIABILITY COMPANIES, AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A, | |
| Defendants. | |

### MOMCOZY'S EMERGENCY MOTION TO VACATE THE
### TEMPORARY RESTRAINING ORDER

Defendant Momcozy Maternity Essential ("Momcozy" or "Defendant"), by and through its counsels, hereby respectfully submits this motion to vacate the Temporary Restraining Order ("TRO") entered on October 8, 2024. Dkt. No. 59.

Per Local Rule 7.1(d)(1), Defendant states that the entry of the TRO will result in the total shutdown of Defendant's online store. Between the time when the alleged infringing product was put on sale in the Momcozy store (October 5, 2023) till today, Defendant's Amazon store generated revenues of **70 million dollars**, and the allegedly infringing product constitutes only a very small portion (**2.55%**) of the annual revenue. Gong Decl. at ¶ 4. The TRO, on the condition that Plaintiff only pays a paltry $10,000 dollar bond, directs marketplaces like Amazon to "restrain the transfer of all funds" (Dkt. 59, at 7), which is effectively crippling Defendant's ability to continue its business. This TRO gives Plaintiff unfair bargaining power to pressure Defendant into paying a higher settlement fee in order to save the company. As a result, Defendant will be unable to pay suppliers, shippers, employees, Amazon for warehousing and shipping, and the government for taxes. This will cause irreparable harm to the Defendant, and immediate action by the Court is necessary to address this situation.

**REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), Defendant Momcozy respectfully requests a hearing on Defendant's motion to vacate. In this case, Plaintiff has conflated unregistered trade dress and registered trade dress in its arguments, making it difficult for the Court to understand the facts accurately. Moreover, Plaintiff has named multiple defendants in this action without clearly specifying which defendant is allegedly infringing on which trade dress or copyright in its motion. Oral argument will assist the Court in clarifying the allegations specific to Defendant Momcozy, as well as help both parties present their arguments more clearly for a prompt resolution. Defendant estimates that the hearing will take less than one hour.

## I. INTRODUCTION

Tushbaby's motion for a Temporary Restraining Order is rife with misinformation and misleading statements. The gamesmanship employed by the Plaintiff includes several tactics: First, Tushbaby conflates its unregistered trade dress with its registered trade dress, seeking the Court's acknowledgment of the presumed secondary meaning of the registered trade dress while simultaneously misleading the Court into extending protection to the broader scope claimed for the unregistered trade dress. Second, Tushbaby strategically groups Momcozy's products—one of its largest competitors—with other products in its lawsuit, preventing the Court from fully appreciating the distinctions among them. Lastly, Tushbaby presents multiple blatant falsehoods that mislead the Court regarding Momcozy's role and involvement in the matter.

## II. LEGAL STANDARDS

The standard for granting a temporary restraining order and a preliminary injunction are identical. *See Emerging Vision, Inc. v. Glachman*, No. 10-cv-80734, 2010 WL 3293346, at *3 (S.D. Fla. June 29, 2010). Since Plaintiff has already outlined the standard for a TRO in its motion, Defendant sees no need to waste valuable pages by repeating this well-known standard and will directly move to present Defendant's arguments.

## III. ARGUMENT

### A.   THE TRO SHOULD BE <u>VACATED</u> BECAUSE THE LANGUAGE USED IS OVERLY BROAD

On its face, the injunction order should be vacated or at least modified. It is a well settled rule that a district court must abide by Rule 65(d)'s "requirement that injunctions state their terms specifically and 'describe in reasonable detail' the 'act or acts restrained or required'" in determining whether to enter proposed injunctive relief. *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1361 (11th Cir. 2019)

The Eleventh Circuit's strict adherence to Rule 65(d) is "designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *SEC v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012). The skepticism of vague and overbroad injunctions embodies two ideas: (1) that "[a]n injunction should clearly let defendant know what he is ordered to do or not to do," and (2) that "court order[s] should be phrased in terms of objective actions, not legal conclusions." *Id*. (quotations omitted).

The need for courts to speak clearly is more than theoretical—if a defendant refuses to comply with an injunction, contempt proceedings that will test an order's clarity tend to follow. *United States v. City of Tampa*, 2024 U.S. Dist. LEXIS 110770, *22, __ F.Supp.3d __. To "provide meaningful and unique relief to [a] plaintiff" who has secured an injunction, the order must be capable of being enforced by coercive contempt, which imposes a continuing sanction until the defendant relents. *Chandler v. James*, 180 F.3d 1254, 1270-71 (11th Cir. 1999) (Tjoflat, J., specially concurring) (explaining that, generally, only an injunction enforceable by coercive contempt is an appropriate use of a federal district court's equitable authority). In all cases, but especially in a coercive contempt proceeding where the contemnor risks open-ended sanctions until he complies with the injunction, vagueness "deprive[s] defendants of the procedural protections that would ordinarily accompany a future charge of a violation of [federal law]." *Goble*, 682 F.3d at 949.

This rule is also well recognized in other circuits, including the 7th Circuit and the Federal Circuit, particularly in cases involving injunction orders against online sellers.

In *ABC Corp. I v. P'ship & Unincorporated Ass'ns Identified on Schedule "A"*, the **Federal Circuit** ruled that the preliminary injunction order issued by the district court is overbroad because the order used language such as "[t]he Gyroor Defendants . . . be preliminarily enjoined and restrained from . . . offering for sale, selling, and importing **any products . . . that include any reproduction, copy or colorable imitation of the design claimed in the Patents-in-Suit**." 52 F.4th 934, 945 (Fed. Cir. 2022). The Federal Circuit thinks that the order failed to mention or specifically enjoin "Accused Products A through D." *Id*. The Federal Court ruled that "while the order allows plaintiffs to request that Amazon remove specific product IDs and orders Gyroor to remove specific product URLs, this does not narrow the scope of the injunction's broad enjoining of "any reproduction, copy or colorable imitation" of the patented designs." *Id*.

In case *Patriot Homes, Inc. v. Forest River Hous., Inc.*, the **Seventh Circuit** vacated a preliminary injunction enjoining a defendant from "[u]sing, copying, disclosing, converting, appropriating, retaining, selling, transferring, or otherwise exploiting Patriot's copyrights, confidential information, trade secrets, or computer files." 512 F.3d 412, 414 (7th Cir. 2008). The Seventh Circuit thinks this order was deficient because it "use[d] a collection of verbs to prohibit [the defendant] from engaging in certain conduct, **but ultimately it fail[ed] to detail**

**what the conduct [was],** i.e., the substance of the 'trade secret' or 'confidential information' to which the verbs refer." *Id.*

The same problem exists in this TRO. This Court used language such as "From directly or indirectly manufacturing, importing, advertising, ..., **any products** which infringe upon the TUSHBABY Trade Dress," "From secreting, concealing, destroying, selling off, transferring, or otherwise disposing of... any products... bearing Plaintiff's Copyrights and/or Trade Dress," and "This Order shall apply to the Seller IDs, associated e-commerce stores and websites and any other seller identification names, ..., for the purpose of infringing Plaintiff's Copyrights and/or Trade Dress." However, Defendant is unclear about **which specific product or products** the Court has determined to infringe upon Plaintiff's trade dress/copyright. In the Court's October 8 order, the Court only specified the Defendant's store ID A3IKW5RKYL1IYC, but did not clarify which **particular product or ASIN** is being accused of infringement. Currently, Defendant's store offers more than a hundred different products, including bras, belly bands, compression socks, breast pumps, and multiple types of baby carriers, with more than a thousand promotional images. Gong Decl. at ¶ 3.  This lack of specificity leaves Defendant unsure of how to comply with the order and the scope of what is required.

The defendant is also unclear if this injunction order has the right to enjoin non-party (associated e-commerce stores). The Eleventh Circuit has been cautious in this question. The chief function of a preliminary injunction "is to preserve the status quo" between the parties. *Northeastern Fla. Chapter of Ass'n of Gen. Contractors*, 896 F.2d at 1284. The Court does not have jurisdiction to enjoin a person who is not a party to the lawsuit or determined to be "in active concert" with a party. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 112, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969) (holding that the district court erred by enjoining a non-party); *In re Infant Formula Antitrust Litig.*, MDL 878 v. Abbott Lab's, 72 F.3d 842, 842-43 (11th Cir. 1995) (affirming the district court's denial of injunctive relief against a non-party for lack of subject matter jurisdiction); *Jackson v. Baisden*, No. 21-13004-J, 2022 U.S. App. LEXIS 4303, 2022 WL 610314, at *1 (11th Cir. Feb. 16, 2022) (holding that the district court lacked subject matter jurisdiction to grant injunctive relief against officials at the plaintiff's prison who were not parties to the case).

The vague, broad, and even ambiguous language in the TRO grants Plaintiff a powerful tool, potentially allowing them to demand the removal of any product from Amazon that they

unilaterally deem infringing with zero judicial review. As a result, Defendant respectfully requests that the Court vacate the current injunction order or, at the very least, modify the order to clearly identify the alleged infringing product(s) and the complying party/parties.

**B.   THE TRO SHOULD BE <u>VACATED</u> BECAUSE NO LEGAL OR FACTUAL ANALYSIS IS CONDUCTED**

When issuing the TRO, this Court did not address any of the legal or factual issues regarding trade dress infringement and copyright infringement. The Court's October 8 order includes only three sections: "Factual Background," "Legal Standard," and "Conclusion of Law." For instance, the Court did not analyze why Defendant's promotional photos were deemed to infringe upon Plaintiff's copyrights. Self-evidently, the photographs are not direct, literal copies. There is no analysis and, thus, no opportunity for Defendant to defend itself (or restraint on Plaintiff to keep it from arguing that other product photographs infringe too). Additionally, the Court failed to explain how Defendant's product, which clearly lacks a flap, could create a likelihood of confusion among customers when Plaintiff's registered trademark explicitly includes a pocket and a flap. The issuance of the TRO constitutes a clear abuse of discretion, as it lacks sufficient legal or factual analysis. *See VPR Brands, LP v. Shenzhen Weiboli Tech. Co.*, No. 2023-1544, 2024 U.S. App. LEXIS 20450, at *18 (Fed. Cir. Aug. 14, 2024) (The Federal Circuit vacated the preliminary injunction entered by the district court for abusing its discretion by misinterpreting the Eleventh Circuit's guidance and unreasonably rejecting Weiboli's unlawful-use defense **without adequate legal or factual analysis**).

**C.   THE TRO SHOULD BE <u>VACATED</u> BECAUSE THERE IS NO LIKELIHOOD OF SUCCESS ON PLAINTIFF'S CLAIMS**

Plaintiff argued that it is likely to success on three claims, a) trade dress infringement, b) unfair competition and false designation of origin, and c) copyright infringement. Because the legal standard for trade dress infringement and unfair competition and false designation of origin is essentially the same, *Turner Greenberg Assocs., Inc. v. C&C Imports, Inc.*, 320 F. Supp. 2d 1317, 1330 (S.D. Fla. 2004), Defendant will address these two claims under a single section. Defendant will now respond to Plaintiff's arguments *seriatim*.

**1.   TRADE DRESS INFRINGEMENT AND UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN**

Defendant categorizes Plaintiff's motion as a form of gamesmanship that should be

curtailed and even sanctioned. Here's why: In Plaintiff's motion, while arguing its trade dress infringement claim, Plaintiff states that "The TUSHBABY Trade Dress is registered on the Principal Register[1], thereby entitling it to the **presumption that it is distinctive and nonfunctional.**" (Dkt. 51, at 8, ¶ 3). Essentially, Plaintiff's motion for a TRO regarding trade dress infringement relies entirely on their registered trade dress, particularly because the Plaintiff seeks to benefit from the presumption of secondary meaning. See 15 U.S.C. § 1115(a); *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000).

However, when delineating the scope of Plaintiff's registered trade dress, Defendant states, "Among other features, the TUSHBABY Trade Dress features **a logo centered on a rounded front pouch with wraparound black straps, side zippered pockets, and mesh side pockets,**" Dkt. 51, at 3, ¶ 1, and includes a drawing illustrating the alleged trade dress. *Id*. at 23. Defendant's statement, along with the provided picture, surprisingly and misleadingly encompasses the entirety of Plaintiff's product design.

This exemplifies Plaintiff's gamesmanship, as the scope protected by Plaintiff's registered trade dress is significantly narrower than that of unregistered trade dress. Worth noting, **The Court's TRO only addressed the infringement of the Registered Trade dress, which was referred as "TUSHBABY Trade Dress".** Dkt. 59, at 2.

| Plaintiff's Asserted *Unregistered* Trade Dress | Plaintiff's *Registered* Trade Dress | (Demonstrative) *Registered* Trade Dress |
|---|---|---|
|  |  |  |
| (ALL of them are solid lines.) | (Most of them are dotted lines) | |

To prevent the Plaintiff from conflating unregistered trade dress with registered trade dress and further misleading the Court, the Defendant will respond to the trade dress infringement claims in following two sections

---

[1] Registration No. 7,489,071 ("Registered Trade Dress")

### a)  Plaintiff's Unregistered Trade Dress

Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying. As the Supreme Court has explained, copying is not always discouraged or disfavored by the laws which preserve our competitive economy. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 160, 103 L. Ed. 2d 118, 109 S. Ct. 971 (1989). Allowing competitors to copy will have salutary effects in many instances. "Reverse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology." *Ibid.*

Succeeding on a trade-dress infringement claim requires Plaintiffs to show that (1) the trade dress is inherently distinctive or has acquired secondary meaning; (2) the trade dress is primarily nonfunctional; and (3) the parties' trade dresses are confusingly similar. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986).

As for the first element, it is the Supreme Court's opinion that product design trade dress could **never be inherently distinctive** and always **required proof of secondary meaning**. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212, 120 S. Ct. 1339, 146 L. Ed. 2d 182, 54 U.S.P.Q.2d 1065 (2000) ("[Product] design, like color, is not inherently distinctive."). The Supreme Court agrees that product design is unlikely to be perceived as trade dress that indicates source. In its 2021 *Traffix* decision, the Supreme Court stated that in its view, a product shape is not likely to be perceived as an indicator of origin, "we were careful to caution against misuse or over-extension of trade dress. We note that 'product design almost invariably serves purposes other than source identification.'" *Traffix Devices v. Mktg. Displays*, 532 U.S. 23, 29, 121 S. Ct. 1255, 1260 (2001).

### i.    Lack of distinctiveness

In assessing inherent distinctiveness, courts must examine the trade dress and consider "whether [it] is a common basic shape or design, whether it is unique or unusual in a particular field, and whether it is a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods." *Miller's Ale House,* 702 F.3d at 1323. The ultimate question in determining whether a product's trade dress is distinctive is not whether "each element or part" of the dress is distinctive, but rather whether the combination of elements, taken "as a whole," conveys a

unique impression. *Remcraft Lighting Prod., Inc. v. Maxim Lighting, Inc.*, 706 F. Supp. 855, 858 (S.D. Fla. 1989).

Plaintiff claims trade dress "consists of the overall design and configuration of the product featuring a distinctive rounded pouch with a button snap closure and a logo centered on the front, black wraparound straps with various neutral colors for the outer shell material, and the configuration of the side zipper and mesh pockets." Dkt. 51, at 3, ¶ 1. However, the overall design of Plaintiff's alleged trade dress cannot be distinctive, because it is the common design for the same kind of products in the relevant market. As shown in Exhibit A, multiple applications have disclosed all the overall design of Plaintiff's alleged trade dress. Plaintiff's description of its trade dress as "A logo centered on a rounded front pouch with wraparound black straps, side zippered pockets, and mesh side pockets" cannot render the alleged trade dress distinctive because it is not sufficiently distinct that it can be differentiated from other products. *Remcraft Lighting Products*, 706 F. Supp. at 858. Also see Exhibit B, Plaintiff's own submission to PTO.



| Patent US 9,700,152 | Patent US 2019/0350380 | Plaintiff's Trade Dress |
|---|---|---|
| Exhibit B, at 8 | Exhibit B, at 13. | Exhibit B, at 13 |

### ii.    Lack of Secondary meaning

Plaintiff now is claiming unregistered trade dress for a product, baby hip seat carrier. However, Plaintiff failed to provide any evidence or even argument to prove the secondary

meaning. *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 857 (11th Cir. 1983) ("To establish secondary meaning the plaintiff must show that the primary significance of the product in the minds of the consuming public is not the product itself but the producer"; affirming finding of no secondary meaning and denial of claim of infringer of trade dress in design on sports shoes.)

Secondary meaning "'occurs when, in the minds of the public, the primary significance of [the] trade dress is to identify the source of the product rather than the product itself.'" *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC,* 702 F.3d 1312, 1322 (11th Cir. 2012). The courts in this Circuit consider four factors to determine whether a trade dress has acquired secondary meaning, (1) The length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the trade dress and the plaintiff's business; and (4) the extent to which the public actually identifies the trade dress with the plaintiff's products. *Olem Shoe Corp. v. Washington Shoe Co.*, 2011 WL 6202282, at *20 (S.D. Fla. Dec. 1, 2011), aff'd, 591 F. App'x 873 (11th Cir. 2015).

First, as to the length and manner of use, most courts agree that "exclusive" and "substantial" use is "circumstantial evidence that secondary meaning has attached to the Plaintiff's trade dress." *Remcraft Lighting Prod., Inc. v. Maxim Lighting, Inc.*, 706 F. Supp. 855, 858 (S.D. Fla. 1989). By Plaintiff's own admission to the USPTO, similar products have been patented and publicly on sale many years since 2018, such as Ergobaby. Exhibit B, at 6, 13, 19, 23, 27. Furthermore, as demonstrated by the numerous similar products in Exhibit A Patents, the existence of many comparable trade dresses by third parties strongly argues against any finding of secondary meaning

Second, Plaintiff alleged that it markets the trade dress entering as a contestant on a television show and received many views. Dkt. 51-1, ¶ 7. For advertising to serve as evidence to prove secondary meaning in a trade dress case, the advertising must draw attention to the alleged trade dress. Similarly, to use the volume of sales to serve as evidence to prove secondary meaning in a trade dress, there must be some proof that the sales were generated by the alleged trade dress rather than by factors other than source identification. *Hard Rock Cafe Int'l USA, Inc. v. RockStar Hotels, Inc*., 2018 WL 7825183, at *18 (S.D. Fla. June 13, 2018). Plaintiff fails to show that its advertising drew attention to the alleged trade dress and, indeed, fails to  provide

any proof to show that its sales were generated by the alleged trade dress rather than by factors other than source identification. Plaintiff also fails to show its efforts to promote a conscious connection in the public's mind between the trade dress and the plaintiff's business. Thus, the second and third factors weigh against Plaintiff.

Third, it is clear that Plaintiff fails to (and that it actually cannot) provide any evidence, such as survey, to show the public actually identifies the trade dress with the plaintiff's products.

Thus, all the four factors weigh against a finding of secondary meaning.

### iii.    Plaintiff's alleged trade dress is functional

Plaintiff also fails to show its alleged trade dress is not functional. "A product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of an article." *Eppendorf Netheler Hinz GmbH v. Ritter GmbH*, 289 F.3d 351, 355 (5th Cir. 2002) (*citing Traffix*, 532 U.S. at 28). "Under this traditional definition, if a product feature is 'the reason the device works,' then the feature is functional. The availability of alternative designs is irrelevant." *Id*. "

Clearly the curved top of the carrier is sold to the public as being functional. Further, Plaintiff claims that various attachments and adornments such as the waist belt, bottle holder, phone pocket etc. are trade dress and subject to protection as such. See Dkt. 51, at 25-29. Nothing could be further from the truth. The items claimed as trade dress by Plaintiff are functional and therefore, not susceptible to protection as such. Furthermore, "trademark and trade dress law cannot be used to evade the requirements of utility patents," *Valu Eng'g, Inc. v. Rexnord Corp*., 278 F.3d 1268, 1273 (Fed. Cir. 2002). "A utility patent is strong evidence that the features therein claimed are functional." *Traffix*, 523 U.S. at 29. There are so many utility patents that can clearly demonstrate that the alleged trade dress is functional. *See, e.g.*, Exhibit A. For example, US Patent No. US 2016/0286980 A1 disclosed all the features of the alleged trade dress as functional. Moreover, Plaintiff has not met its burden of production regarding non-functionality. [F]eatures are deemed functional **until proved otherwise** by the party seeking trade dress protection." *Traffix* , 532 U.S. at 30.

### iv.    No similarity between Defendant's product and alleged trade dress.

Plaintiff fails to establish any of the elements to prove unregistered trade dress infringement, and therefore, Defendant does not infringe upon Plaintiff's unregistered trade dress.

| Plaintiff's Unregistered Trade Dress | Defendant's product |
|---|---|
| "A logo centered on a rounded front pouch with wraparound black straps, side zippered pockets, and mesh side pockets" | The logo is directly printed on the upper center of a solid front pouch (zipper on the side), without a flap, or mesh side pockets |



### b) Plaintiff's Registered Trade Dress

Even if the registration of the trade dress benefits from the presumption of secondary meaning and non-functionality, *See* 1 McCarthy on Trademarks and Unfair Competition § 7:72 (5th ed.), the registration and its accompanying presumption of secondary meaning operate only **prospectively from the date of registration,** i.e., the date on which the Patent and Trademark Office ("PTO") determined that secondary meaning had been acquired. See 15 U.S.C. §§ 1052(f), 1057(a)–(b), 1115(a). *Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*, 909 F.3d 1110, 1117 (Fed. Cir. 2018). Here, Plaintiff only registered its trade dress on August 27, 2024, i.e., two months ago.

Moreover, Defendants can still rebut the presumption of validity by a preponderance of the evidence that the mark is ineligible for protection. *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc*., 696 F.3d 206, 216 n. 10 (2d Cir. 2012). However, due to the time constraints, it would be impractical for Defendant to prepare evidence such as surveys or expert opinions to rebut that presumption. Therefore, Defendant's argument will focus on the third element of trade dress infringement—whether the parties' trade dresses are confusingly similar.

### i. What is the actual protected Registered Trade Dress in this Case?

In Plaintiff's motion, Plaintiff repetitively stated that "The defining characteristics of the TUSHBABY Hip Seat Baby Carrier are the **Tushbaby Logo centered on a rounded front pouch, black wraparound straps, a variety of neutral colors for the outer shell material, and the configuration of side zipper and mesh pockets**." Dkt. 51, at 11.

A simple review of the Plaintiff's trade dress application history reveals the truth.

Contrary to the representations made in the Plaintiff's motion, the protected Registered Trade Dress covers only a very small portion of the Plaintiff's product. As stated by Plaintiff in its Response to Office Action "The mark consists of a three-dimensional the configuration **of a pocket and a flap**. The matter shown **in dotted lines** is not part of the claimed mark." Exhibit C

Plaintiff's response was made to the PTO after USPTO issued an office action, in which the Examiner attorney specifically stated: "If the applicant is applying for a three-dimensional configuration mark that is trade dress, the applicant must amend the description to provide a clear and concise description of the mark that: (1) indicates the mark is a three-dimensional configuration of the product design or packaging, or of a specific design feature of the product design or packaging; (2) specifies all the elements in the drawing that constitute the mark and are claimed as part of the mark; and (3) specifies any elements that are not part of the mark and indicates that the matter shown in broken or dotted lines is not part of the mark and serves only to show the position or placement of the mark." Exhibit D. The end result is shown below.

**There is no logo, no black wraparound straps, no neutral colors for the outer shell material, no side zipper, and no mesh pockets**. Dkt. 51, at 11.



| Plaintiff's *Registered* Trade Dress | (Demonstrative)*Registered* Trade Dress | Defendant's product |
|---|---|---|
| (Most of them are dashed lines) | | |

### ii.    There is simply no likelihood of confusion

Now we address the elements of likelihood of confusion. In determining whether a likelihood of confusion exists, the fact finder evaluates a number of elements including: the strength of the trade dress, the similarity of design, the similarity of the product, the similarity of retail outlets and purchasers, the similarity of advertising media used, the defendant's intent, and actual confusion. A court must evaluate the weight to be accorded the individual factors and then make its ultimate decision. The appropriate weight to be given to each of these factors varies

with the circumstances of the case. *AmBrit, Inc. v. Kraft, Inc*., 812 F.2d 1531, 1538 (11th Cir. 1986).

It is the Eleventh Circuit's position that "district court's failure to consider all the factors relevant to the issue of whether two marks are confusingly similar does not necessarily constitute reversible error." *Dippin's Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1207–08 (11th Cir. 2004). This means that, under certain circumstances, the court can make a decision by considering only some of the relevant factors without reviewing all of them, as long as the decision is still supported by the overall evidence.

In this case, there is simply no "general similarity." Plaintiff confidently asserts that Plaintiff's trade dress and Defendant's trade dress are "practically identical" (Dkt. 51, at 11). However, the differences are far from "identical." In fact, the two trade dresses are overwhelmingly dissimilar, even upon a quick and cursory viewing. Plaintiff actually admitted that Defendant's product is different than Plaintiff's trade dress. In Plaintiff's submission to PTO, in order to convince PTO that its trade dress is non-functional, Plaintiff argued that the existence of alternative design can prove Plaintiff's trade dress is not functional. Exhibit B, at 5. The Plaintiff then listed seat carrier from amazon store "shsyue," and Walmart store "FEBFOXs," claiming them to be alternative designs. *Id*., at 6. It is evident that the products from shsyue, Febfox, and Momcozy do not feature a flap and a pocket. Since the Plaintiff has asserted that the designs of shsyue and Febfox are different from its own, it is logically inconsistent for the Plaintiff to claim that Momcozy infringes on its trade dress as shown below:



| Plaintiff's Trade Dress | Momcozy | shsyue | FEBFOXS |
|---|---|---|---|

Defendant's store generates nearly $80 million dollars per year, and Momcozy has registered at least 18 trademarks in the United States and 140 trademarks globally. Gong Decl. at ¶5. Defendant has invested a total of 15 million dollars in advertising and promoting the Momcozy brand since the store was established. *Id.* at ¶6. Specifically, $187,845.83 has been spent promoting the allegedly infringing product. *Id.* Plaintiff has only spent approximately $12

million on advertising for the Tushbaby brand since 2018. *See* Plaintiff's founder's declaration to PTO attached as Exhibit E, at ¶13. Ms. Tamara Rant also admitted under oath that her registered trade dress comprises of "a pocket and a flap with a snap on the flap and label above the snap." Exhibit E, at ¶6. Ms. Rant never tried to claim trade dress protection for her entire product. *Id*.

The Defendant has no intention of spending millions of dollars promotion cost so it can infringe on Tushbaby's trade dress. Additionally, the Defendant's advertising was conducted through Amazon, whereas the Plaintiff used television for advertising.  Exhibit E, at ¶14. The Plaintiff has not provided any convincing evidence showing actual customer confusion, especially considering that the Defendant's own trademark is prominently displayed on the front of the product. While both parties sell products through online platforms, this does not change the fact that the majority of factors favor the Defendant.

### 2.   COPYRIGHT INFRINGEMENT

| Plaintiff's Copyright | Defendant's Promotion Photo |
| --- | --- |



This is the most malicious claim made by the Plaintiff against the Defendant. First and foremost, the Plaintiff provided **zero (0)** legal analysis regarding the copyright infringement of Momcozy's commercial photo. The entire copyright infringement argument was completed in just one page, consisting of two paragraphs. The Plaintiff merely cited legal authorities and attached a comparison image, expecting the court to conclude infringement without any substantive legal reasoning. Although the Plaintiff claims to own the following copyrights:

Copyright Office Registration Nos. VA 2-360-715, VA 2-360-714, VA 2-360-713, VAu 1-511-350, VAu 1-511-372, and VA 2-395-564, Dkt. 51, at 3, the Plaintiff only provided a "non-exhaustive" comparison in their motion. Dkt. 51, at 13. Regarding Defendant Momcozy, the Plaintiff made only the following comparison, as the Plaintiff has chosen to forgo including other photos in the preliminary injunction alleging infringement. Therefore, Momcozy only needs to respond to this limited comparison.

The first step in evaluating the likelihood that Plaintiff will succeed on the merits of its claim for copyright infringement, is to determine whether it has established the *prima facie* elements of a copyright infringement claim: (1) that Plaintiff owns a valid copyright and (2) that Defendant copied original elements Plaintiff's copyright. *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265–66 (11th Cir. 2001).

First, even though Plaintiff has registered the alleged copyrighted photographs, it does not necessarily mean that Plaintiff's copyrights are valid and protectable. For example, Plaintiff claims exclusive intellectual property right for the photographs of a woman holding a baby, which is to show the function of the product, baby carrier as shown above. However, the same kind of design has been disclosed and widely used in the market years before Plaintiff. A utility patent filed on July, 30, 2019, whose provisional application filed in 2017 has disclosed the same structure of Plaintiff's photographs. Exhibit A, at 6-8. As discussed above, Plaintiff's founder Ms. Rant admitted that Plaintiff's brand was first established in 2018. A true and correct copy of the application is attached hereto as Exhibit E, at ¶4. The drawings in the application, as shown below, discloses the same design of Plaintiff's copyrights which renders that Plaintiff's copyrights are invalid and have no protectable design



FIG. 7G        FIG. 7H        FIG. 7I        FIG. 7A        FIG. 7B        FIG. 7C

Second, a copyright protection exists "in original works of authorship fixed in any tangible medium or expression . . . from which they can be perceived, reproduced, or otherwise communicated . . . ." 17 U.S.C. § 102(a). But "[i]n no case does copyright protection for an

14

original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). *Regalado v. Atrium Health*, No. 24-10228, 2024 U.S. App. LEXIS 20498, at *7 (11th Cir. Aug. 14, 2024).

The line between idea and expression in copyright infringement cases is often blurry and difficult to identify in the context of a photograph. *Reece v. Island Treasures Art Gallery, Inc.*, 468 F. Supp. 2d 1197, 1205 (D. Haw. 2006). The protectable elements of a photograph generally include lighting, selection of film and camera, angle of photograph, and determination of the precise time when the photograph is to be taken. *See 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright*, § 2.08[E][1], at 2-130 (1999).

  

In *Reece* , the Plaintiff sought to enjoin the defendant from selling and displaying stained glass art that was similar to plaintiff's photograph in that they both "depict, from the same angle, a woman kneeling on Oahu's Kailua beach performing an 'ike motion from the hula noho (sitting) position." The court found the works were not substantially similar even though the women in each work **had the same pose**, **similar clothing**, and **were depicted in the same orientation**. *Id*. at 1204. The court examined the protectable elements, and determined that the images were not substantially similar because (1) the appearance of the dancers in the stained glass image was different because it lacked detail; (2) the dancer in the stained glass image had "no facial features, hand details, or muscular differentiation"; (3) [t]he mountains and ocean dominate the upper half of the stained glass, but not the photograph"; (4) [t]he dancers' hairstyles are notably different lengths and shapes"; and (5) "the sepia tone of the photograph is markedly contrasted by the vibrant colors of the stained glass." *Id*.at 1208.

In this case, the distinctions between the works are as apparent as those in *Reece*, where the court found no substantial similarity despite shared poses and orientation. Here, the background design is significantly different, the mother figure's hairstyle and direction of the

15

face are distinct, the infant's facial expression and sitting posture vary, and the clothing choices—including both color and type (short-sleeve vs. long-sleeve)—are notably different. These clear visual differences, as in Reece, demonstrate that the works are not substantially similar in their protectable elements. If the Plaintiff insists that the Defendant's photos constitute infringement, then by the same logic, the Plaintiff's photos would equally infringe upon the rights of the above utility photos

Finally, **independent creation is a complete defense to a claim of copyright infringement**. *See Whelan Assocs. v. Jaslow Dental Lab, Inc.*, 797 F.2d 1222, 1228 n.7 (3d Cir. 1986) ("The independent creation of even identical works is therefore not a copyright infringement, and independent creation is a complete defense to a claim of copyright infringement."), *see also Blehm v. Jacobs*, Civil Action No. 09-cv-02865-RPM, 2011 U.S. Dist. LEXIS 105583, at *4 (D. Colo. Sep. 19, 2011), *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020). *Design Basics, LLC v. Signature Constr., Inc.*, 994 F.3d 879, 887 (7th Cir. 2021). Defendant did not merely create the single alleged infringing photo; in fact, Defendant photographed a series of images for this product, featuring various compositions, poses, backgrounds, and actions. See Exhibit F. The photos Defendant used are part of a series of promotional images Defendant created for this product. Gong Decl. at ¶ 7. Defendant hired its own photographer and model, and prior to taking these promotional photos, the Defendant had no knowledge of the Plaintiff's copyrighted photos and never referenced them. *Id*. Moreover, as an infant carrier seat, there are only a limited number of poses that can be utilized for product promotion.*Id*. There is no doubt that Defendant independently created this alleged infringing photo along with other promotional images. Therefore, Defendant has a complete defense against Plaintiff's copyright infringement claim.

Thus, Plaintiff's TRO should be vacated because Plaintiff failed to prove a likelihood of success on any of its claims.

## D.  THE TRO SHOULD BE <u>VACATED</u> BECAUSE PLAINTIFF HAS NOT SHOWN IRREPARABLE HARM

Irreparable harm is the "'sine qua non of injunctive relief.'" *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*quoting Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). Even where movants establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury

would, standing alone, make preliminary injunctive relief improper. *Siegel*, 234 F.3d at 1176 (*citing Snook v. Trust Co. Of Georgia Bank of Savannah, N.A*., 909 F.2d 480, 486 (11th Cir. 1990) (affirming denial of a preliminary injunction even though plaintiff established a likelihood of prevailing because plaintiff failed to meet the burden of proving irreparable injury). The Supreme Court also held that injunction does not automatically follow the determination of infringement, and that courts should continue to employ equitable principles rather than categorical rules when considering whether an injunction should issue and whether irreparable harm will be suffered in the absence of an injunction. *eBay Inc. v. Mercexchange, L.L.C.*, 547 U.S. 388, 390 (2006).

Plaintiff again provided **zero (0)** evidence to prove irreparable harm. Plaintiff's entire argument of irreparable harm relies on the "presumption of irreparable harm" theory based on the establishment of a likelihood of success on the merits of its trade dress and copyright registrations. Dkt. 51, at 13, ¶ 2. However, as mentioned above, Plaintiff failed to show a likelihood of success on the merits for both of its trade dress and copyright infringement claims. Thus, there is no presumption of irreparable harm in this case.

On the contrary, the TRO will cause irreparable harm to the Defendant. As stated in the Gong Declaration, Defendant has generated roughly $70 million in revenue from October 2023 to the present, averaging $7 million per month and $230,000 in daily sales.[2] The alleged infringing product constitutes only 2.55% of total sales. Gong Decl. at ¶4. The TRO requires Amazon to freeze the Defendant's entire financial account, which will inevitably lead to the Defendant being unable to pay suppliers, shippers, employees, Amazon for warehousing and shipping, and the government for taxes.

As a significant Amazon seller, Defendant cannot forgo an annual revenue of $80 million for the sake of this case. It is not feasible for Defendant to transfer funds back to China and close this store. The Defendant is prepared to pay if found liable, as Plaintiff's losses can be accurately assessed through Amazon's backend records. Harm is considered irreparable only if it cannot be undone through monetary remedies. *See Ferrero v. Associated Materials, Inc*., 923 F.2d 1441, 1449 (11th Cir. 2001).

Moreover, Amazon continuously monitors and scores each seller's account performance, including the number of infringement complaints filed against them. Gong Decl. at ¶ 9. Amazon

---

[2] Plaintiff's total revenue of products bearing the TushBaby Trade Dress is approximately $33 million. Exhibit E, at ¶33.

reserves the right to deactivate selling accounts without prior notice. *Id*. Amazon has been known to deactivate accounts suddenly, and Defendant's selling account may soon be suspended due to this current TRO. It is widely understood in the industry that maintaining active sales is crucial for enhancing sales rank. *Id*. at ¶ 12. Conversely, if sales cease, the sales rank can drop sharply. *Id*. Defendant is doing very well in selling product on Amazon.  *Id*. at ¶ 11. The current circumstances are damaging to the Defendant's goodwill and reputation, and even if the listings are reinstated, it will be exceedingly challenging for the Defendant to regain its prior ranking in the near future. *Id*.  at ¶ 13. Additionally, if the listing is taken down for an extended period, it could result in Amazon destroying all of the Defendant's inventory, leading to irreparable losses. A $10,000 bond is far from sufficient to cover such damages.

Thus, Plaintiff's TRO should be vacated because Plaintiff failed to prove irreparable harm and Defendant will suffer irreparable harm.

**E.     THE TRO SHOULD BE <u>VACATED</u> BECAUSE THE BALANCE OF HARDSHIPS AND PUBLIC POLICY CONSIDERATIONS FAVOR DEFENDANT**

Plaintiff must demonstrate that the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party, and that the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).

When considering preliminary relief, "great care must be taken to assure that the power of a court to require or deter action does not result in unwarranted harm." *Ala. v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005). Here, since Plaintiff failed to show a likelihood of success on merits, it also failed to show the threatened injury outweighs the harm the relief would inflict on the Momcozy, which was discussed in the above section.

Further, Plaintiff has "not establish[ed] a likelihood of success on the merits," and there is substantial question of the infringement and invalidity of the trade dress, the "public interest is best served by denying the preliminary injunction." *Abbott Labs. v. Andrx Pharms., Inc*., 452 F.3d 1331, 1348 (Fed. Cir. 2006). Also, an injunction will harm competition and consumers. "[T]he Supreme Court . . . made clear long ago that 'the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain.'" *Yamashita v. Wilbur-Ellis Co.*, No. C 06- 01690, 2006 WL 1320470, at *8 (N.D. Cal. May 15, 2006) (quoting Lear, Inc. v. Adkins, 395 U.S. 653, 670 (1969)). The relevance of competition to the

public interest is especially acute in this case because this litigation does not stand alone, but rather a part of campaign by Plaintiff against all the baby carrier products sellers, which Plaintiff evidently attempts to monopolize the baby carrier products market.

**F.      IF THE TRO IS NOT VACATED, IT SHOULD BE MODIFIED AND THE BOND SHOULD BE INCREASED**

If the Court determines that the TRO should not be vacated, it is essential to modify its terms to ensure a fair balance between the interests of both parties. *CFTC v. E-Metal Merchants, Inc.*, No. 05-21571-CIV, 2006 U.S. Dist. LEXIS 102965, 2006 WL 8432005, at *7 (S.D. Fla. Jan. 6, 2006) (for asset restraints, "any funds not reasonably related to the ultimate relief requested by Plaintiff should be released").

Fed. R. Civ. P. 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The amount of the security is within the discretion of the trial court, and a court may elect to require no security to be posted at all. *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs.*, LLC, 425 F.3d 964, 971 (11th Cir. 2005). The same applies to the amount of an asset freeze. See, e.g., S.E.C. v. ETS Payphones, Inc., 408 F.3d 727, 735 (11th Cir. 2005) (holding that the plaintiff's burden as to the amount of assets subject to disgorgement, and therefore available for a freeze, was a reasonable approximation of the defendant's ill-gotten gains); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) ("[T]he district court had the authority to freeze those assets which could have been used to satisfy an equitable award of profits.").

**The Defendant proposes to post a $100,000 bond in exchange for the Court's modification of the TRO to release the Defendant's Amazon financial account and reinstate the alleged infringing product**. This approach is a well-recognized practice in similar cases before other district courts, such as the District Court of Massachusetts. Exhibit G

Also, the bond set for the TRO should be increased to adequately reflect the potential damages and losses that the Defendant may incur as a result of the TRO. Given the Defendant's significant revenue generation and the potential for irreparable harm—such as the inability to pay suppliers, employees, and other operational costs—an increased bond is necessary to safeguard the Defendant's financial interests. The current bond amount of **$10,000 is drastically**

19

**insufficient** to cover the extensive losses that the Defendant could face if the TRO remains in place, including potential inventory destruction and loss of sales rank on Amazon.

Therefore, if the Court does not vacate the TRO, it should at a minimum modify the bond requirement to a more appropriate amount that reflects the real and substantial harm the Defendant is likely to experience. This modification will ensure that Plaintiff remains accountable for any damages caused by the TRO while protecting the Defendant's ability to continue its business operations.

## IV. CONCLUSION

For the reasons stated above, Defendant respectfully requests the Court to vacate the TRO entered on October 8, 2024.

## RULE 7.1 (a)(3) CERTIFICATE

Counsel for the Defendant has conferred with Plaintiff who may be affected by the relief sought in the motion in a good faith effort to resolve the issues raised in the motion and has been unable to do so, Defendant has no choice but to file this emergency motion to vacate. Defendant thank the Court for its immediate time and attention to this matter.

/s/ Ruoting Men

## RULE 7.1 (d)(1) CERTIFICATE

After reviewing the facts and researching applicable legal principles, I certify that this motion in fact presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand that an unwarranted certification may lead to sanctions.

/s/ Ruoting Men

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 10, 2024, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Florida, using the electronic case filing system of the court.

October 10, 2024

/s/ Luca L. Hickman
Ruoting Men
GLACIER LAW LLP
41 Madison Ave, Suite 2529
New York, NY 10010
Ruoting.men@glacier.law
212-729-5049

Brandon T. Holmes, Esq. (FBN 1007975)
Luca L. Hickman, Esq. (FBN 118731)
Dinsmore & Shohl LLP
Tampa City Center
201 North Franklin Street, Suite 3050
Tampa, Florida 33602
Telephone: (813) 543-9835
Email: luca.hickman@dinsmore.com

*Attorneys for Defendant*

21